DAS:AAS
F.#2011R00045

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**11-22 M**

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

-against-

DUANE COSTA,
TRENTON DREW,
GARY FRANCE,
FRANK MYERS and
EMORY WATKINS,

          Defendants.

<u>C O M P L A I N T</u>

(18 U.S.C. § 1951)

- - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

          MATTHEW M. RAMARGE, being duly sworn, deposes and states that he is a Special Agent with the Drug Enforcement Administration (the "DEA"), duly appointed according to law and acting as such.

          On or about and between January 8, 2011 and January 9, 2011, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DUANE COSTA, TRENTON DREW, GARY FRANCE, FRANK MYERS, and EMORY WATKINS, together with others, did knowingly and intentionally conspire to obstruct, delay and affect commerce and the movement of articles and commodities in commerce, by robbery of an illegal gambling operation in Hicksville, New York.

          (Title 18, United States Code, Section 1951).

2

The source of your deponent's information and the grounds for his belief are as follows:

1.   I have been a Special Agent with the DEA for approximately three years.  During my tenure with the DEA, I have investigated various federal and state criminal violations including robberies, narcotics trafficking and homicides.  During the course of those investigations, I have conducted physical surveillance, monitored undercover operations, debriefed cooperating witnesses and confidential informants, monitored wiretaps, and interviewed civilian witnesses.

2.   Because this affidavit is being submitted for the purpose of establishing probable cause to arrest, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause.  The information set forth below is based upon my experience and training as a Special Agent, my review of recorded conversations and transcripts, documents and other evidentiary items, debriefing of witnesses, and my discussions with other law enforcement agents.  Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part only.

3.   On January 8, 2011, a cooperating witness (the "CW"), who has previously provided reliable information leading to the prosecution of others, informed agents that he had recently

been contacted by the defendant FRANK MYERS.  During debriefings, the CW informed agents that MYERS wanted to form a group to rob an illegal gambling operation (the "Gambling House") in Hicksville, New York.   Thereafter, the CW, acting at the direction of law enforcement authorities, engaged in a series of telephonic conversations with MYERS and the defendant TRENTON DREW.  All of these conversations were recorded using equipment provided to the CW by law enforcement authorities.

4.   On or about January 8, 2011, the CW placed a telephone call to MYERS.  I have reviewed a recording of this call. In sum and substance and in part, MYERS stated that the robbery crew would include the defendant TRENTON DREW and several individuals recruited by DREW.   During the conversation, MYERS stated, "I'm pretty sure they got mad drinks."  Based on my training, experience, and knowledge of this investigation, I believe that the terms "mad drinks" was a code for firearms, and that MYERS expected DREW and other co-conspirators to bring firearms to the robbery.  MYERS and the CW agreed to perform the robbery on January 9, 2011, in order to wait for DREW to drive from Atlantic City, New Jersey to Hicksville, New York.[1]

5.   On January 9, 2011, the CW and the defendant FRANK MYERS participated in multiple telephone conversations in which

_____

[1]   Based on my training, experience, and knowledge of this investigation, DREW passed through Queens, New York while driving from Atlantic City, New Jersey to Hicksville, New York.

they discussed the robbery.  During these calls, MYERS attempted to persuade the CW to perform the robbery during the day, rather than during the evening, of January 9, 2011.

6.   Additionally, on January 9, 2011 at approximately 1:21 p.m., MYERS sent a text message to the CW's cellular telephone stating, "tha fuckin doors is wide open u can walk trait in."  In response, the CW wrote, "cause the game just started its always like that in the day."  In reply, MYERS wrote, "wow that's crazy easy u should have said that b4.  U should call him nd show him where its at they can walk rt in."  Based on my training, experience, and knowledge of this investigation, I believe that, in this text message exchange, MYERS wrote that he preferred to perform the robbery during the day, as the entrance doors to the gambling establishment were not secured or guarded ("tha fuckin doors is wide open u can walk trait in" and "they can walk rt in"), and instructed the CW to coordinate with the defendant TRENTON DREW ("U should call him nd show him where its at.").

7.   Thereafter, the CW placed a telephone call to the defendant TRENTON DREW.  I have reviewed a recording of this call.  During the conversation, DREW agreed that he would "make it happen tonight."  Based on my training, experience, and knowledge of this investigation, I believe that DREW stated that he would coordinate the robbery to occur during the evening of January 9, 2011 ("make it happen tonight").

8.   In subsequent phone calls on January 9, 2011, recordings of which I have reviewed, the CW and the defendant FRANK MYERS coordinated a meeting with the other members of the robbery crew to occur at approximately 9:00 pm.

9.   At approximately 9:00 pm on January 9, 2011, agents observed the CW drive to a location in the vicinity of Hempstead, Long Island, where a white 2007 Honda Accord (the "Subject Vehicle") was parked.  At this location, agents observed the CW meet with the defendants FRANK MYERS, TRENTON DREW, DUANE COSTA, GARY FRANCE, and EMORY WATKINS.  Thereafter, WATKINS, COSTA, and FRANCE entered the Subject Vehicle, and MYERS, DREW, and the CW entered the CW's vehicle.  WATKINS drove the Subject Vehicle towards the Gambling House, followed by the CW's vehicle.  While en route, the caravan performed several counter-surveillance maneuvers, including repeated turns in succession.

10.   In the vicinity of a parking lot adjacent to the Gambling House, law enforcement agents stopped both vehicles. Agents arrested the defendants FRANK MYERS, TRENTON DREW, DUANE COSTA, GARY FRANCE, and EMORY WATKINS.

11.   Law enforcement conducted an inventory search of the Subject Vehicle, which revealed two loaded firearms, a Ruger .357 Magnum Revolver and a Glock 27 .40 caliber semi-automatic handgun. Additionally, law enforcement retrieved a black ski mask that had been discarded from a window of the Subject Vehicle during the

vehicular stop.  Based on my training, experience, and knowledge of this investigation, I believe that the defendants intended to use these weapons and the ski mask during the planned robbery.

12.  Following their arrest and waiver of <u>Miranda</u> rights, several of the defendants made statements, summarized below in sum and substance and in part.

13.  The defendant FRANK MYERS acknowledged conceiving the idea of robbing the Gambling House.  He further admitted knowledge that he knew that the defendant TRENTON DREW had recruited others to participate in the robbery, and that the robbery crew would be armed when they robbed the Gambling House.

14.  The defendant DUANE COSTA admitted that the defendant EMORY WATKINS had recruited him to participate in the robbery of the Gambling House.  According to COSTA, WATKINS had instructed him to get a car because "they were going to hit this casino spot."  COSTA further admitted that "you can't rob a casino without guns."

15.  Finally, the defendant EMORY WATKINS admitted that he had been recruited to provide the firearms to be used in the robbery of the Gambling House.  WATKINS stated that the defendant GARY FRANCE had initially contacted him concerning the firearms to be used during the robbery.  According to WATKINS, FRANCE was concerned that he did not have enough firearms to perform the robbery successfully and therefore WATKINS agreed to provide two

7

firearms for the robbery.  WATKINS further admitted that he knew that the targeted robbery location was a "gambling place" and that he was concerned that the robbery crew would not have enough firepower to overcome 50 or more victims occupying the Gambling House.  According to WATKINS, MYERS informed WATKINS that MYERS had participated in a prior robbery of the Gambling House, which robbery involved the use of five firearms.

WHEREFORE, your deponent respectfully requests that the defendants DUANE COSTA, TRENTON DREW, GARY FRANCE, FRANK MYERS, and EMORY WATKINS be dealt with according to law.

S. Matthew Ramarge
_____
MATTHEW M. RAMARGE
SPECIAL AGENT
Drug Enforcement Administration

Sworn to before me this
___10th day of January 2011

    S/ Marilyn Go
_____
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK